## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                            **Plaintiff,**<br><br>    **v.**<br><br>**RONALD BAUER A/K/A RONALD J. BAUER and RONALD JACOB BAUER, CRAIG JAMES AURINGER, ALON FRIEDLANDER, MASSIMILIANO ("MAX") POZZONI, DANIEL MARK FERRIS, PETAR DMITROV MIHAYLOV, DAVID SIDOO and ADAM CHRISTOPHER KAMBEITZ,**<br><br>                            **Defendants.** | **Case No. 1:22-cv-3089** |

## <u>COMPLAINT</u>

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Ronald Bauer a/k/a Ronald J. Bauer and Ronald Jacob Bauer ("Bauer"), Craig James Auringer ("Auringer"), Alon Friedlander, Massimilano ("Max") Pozzoni ("Pozzoni"), Daniel Mark Ferris ("Ferris"), Petar Dmitrov Mihaylov ("Mihaylov"), David Sidoo ("Sidoo"), and Adam Christopher Kambeitz ("Kambeitz") (collectively, the "Defendants").

1.      This case concerns a fraudulent scheme comprising a series of highly profitable "pump-and-dumps" of the stock of at least seventeen publicly-traded companies ("Issuers") quoted on U.S. markets.

2.      From at least 2006 and continuing until at least 2020 (the "Relevant Period"), the Defendants formed and acted in various combinations (or "Rings"), on a serial basis, to (a) amass a controlling interest in an Issuer; (b) conceal their collective control of the stock of the

Issuer; (c) fund misleading promotional campaigns to increase investor interest in purchasing the Issuer's stock; and (d) then exploit the buy-side demand they had created by collectively unloading their shares of the stock on unsuspecting retail investors, thereby reaping millions in illicit gains.  Following each such fraud, Defendants divided most of their profits while reinvesting a portion thereof into their next pump-and-dump scheme.  Over the Relevant Period the Defendants garnered more than $145 million in illicit proceeds.

3.      For all but two of these pump-and-dumps, the primary strategist was Defendant Bauer, a London-based recidivist.  Bauer oversaw nearly every aspect of the scheme and most frequently called upon the other Defendants to, among other things, acquire control of the Issuer, arrange for the issuance of shares, and conduct promotional activity.  As referred to herein, the "Bauer Ring" was the most prolific of the Rings and included Defendants Bauer, Auringer, Friedlander, Pozzoni and, beginning around 2010, Defendants Kambeitz and Ferris.[1]  Over the Relevant Period, the Bauer Ring perpetrated the scheme with respect to at least seven Issuers.

4.      A second Ring, comprising the Bauer Ring members plus Defendant Sidoo (the "Sidoo & Bauer Ring Coalition"), perpetrated pump-and-dumps with respect to at least two other Issuers.  A third Ring, comprising the Bauer Ring members plus Defendant Mihaylov (the "Mihaylov & Bauer Ring Coalition"), executed two more pump-and-dumps.  And a fourth Ring, involving Bauer and Ferris (the "Bauer-Ferris Duo"), perpetrated four more pump-and-dumps. Apart from Bauer, Mihaylov and Ferris each also engaged in his own pump-and-dump fraud (sometimes with the assistance of others).

5.      The following table provides an overview of the serial schemes alleged in this Complaint, including each respective pump-and-dump's participants:

---

[1] Ferris left the Bauer Ring in or about 2018.  Kambeitz remains active in the Bauer Ring.

| Issuer | Minimum Date Range of Illicit Share Sales | Approximate Minimum Illicit Proceeds | Bauer | Auringer | Friedlander | Pozozoni | Kambeitz | Ferris | Mihaylov | Sidoo |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Defendant(s) Involved in the Fraud | | | | | | | |
| **Bauer Ring Frauds** | | | | | | | | | | |
| Black Stallion Oil and Gas Inc. | Oct. 2014 – Nov. 2016 | $3.5 million | X | X | X | X | X | X | | |
| PetroTerra Corp. | May 2014 – Sept. 2016 | $3.96 million | X | X | X | X | X | X | | |
| Virtus Oil & Gas Corp. | Feb. 2014 – Jan. 2015 | $23.1 million | X | X | X | X | X | X | | |
| Gray Fox Petroleum Corp. | Nov. 2013 – Aug. 2014 | $11.8 million | X | X | X | X | X | X | | |
| Bison Petroleum Corp. | Feb. 2013 – Sept. 2015 | $2.36 million | X | X | X | X | X | X | | |
| Lone Star Gold Inc. | Aug. 2011 – Jan. 2013 | $4.9 million | X | X | X | | X | X | | |
| True North Energy Corp. | April 2006 – May 2007 | $40.23 million | X | X | X | X | | | | |
| **Sidoo & Bauer Ring Coalition Frauds** | | | | | | | | | | |
| North American Oil & Gas Corp. | July 2013 – Aug. 2014 | $15.23 million | X | X | | | X | | | X |
| American Helium Inc. | Mar. 2018 – Feb. 2020 | $1.45 million | X | X | X | X | X | | | X |
| **Mihaylov & Bauer Ring Coalition Frauds** | | | | | | | | | | |
| Cantabio Pharmaceuticals Inc. | Nov. 2015 – Oct. 2018 | $2.56 million | X | X | X | | X | X | X | |
| Steampunk Wizards Inc. | Aug. 2015 – Nov. 2016 | $3.29 million | X | X | X | X | X | | X | |
| **Bauer-Ferris Duo Frauds** | | | | | | | | | | |
| Polar Petroleum Corp. | Apr. 2013 – June 2013 | $12.4 million | X | | | | | X | | |
| Patriot Berry Farms Inc. | Aug. 2013 – Feb. 2016 | $425 thousand | X | | | | | X | | |
| Black River Petroleum Corp. | Apr. 2014 – May 2014 | $417 thousand | X | | | | | X | | |
| Cyberfort Software Inc. | Nov. 2016 – Dec. 2018 | $1.37 million | X | | | | | X | | |
| **Mihaylov Fraud** | | | | | | | | | | |
| Lifelogger Technologies Corp. | Mar. 2014 – May 2016 | $12.15 million | | | | | | | X | |
| **Ferris Fraud** | | | | | | | | | | |
| Blue Eagle Lithium Inc. | Aug. 2018 – Aug. 2019 | $5.95 million | | | | | | X | | |

6.      Defendants, in the execution of these schemes, often relied on the services of offshore financial firms, typically Swiss-based (hereinafter "Offshore Platforms"), to conceal their control of shares and their collective activities with respect to each Issuer.  They also used front companies and omnibus vehicles[2] administered by the Offshore Platforms to help them commit their fraud.  Through such means, Defendants hid their coordinated efforts from gatekeepers (transfer agents and brokers) who otherwise would have treated their shares as restricted stock, which could not have been freely purchased, sold or transferred in the retail market.  Defendants also flouted their affirmative obligations under the federal securities laws, as controlling shareholders, to report their holdings, trading, and agreements as to the same, and, by so doing, hid their coordinated efforts from investors.

7.      As a result of the conduct alleged in this Complaint, each of the Defendants violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 10b-5(a) and (c) thereunder.  Each of the Defendants also violated Sections 5(a) and 5(c) of the Securities Act.

8.      The Commission seeks permanent injunctions against the Defendants, enjoining each from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act; civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act; an order barring each Defendant from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act; officer/director bars pursuant to Section 21(d)(2) of the Exchange Act; conduct-based injunctions

---

[2] An "omnibus vehicle" is one that effects securities trades and money movements on behalf of multiple different clients, typically using accounts at multiple banks and brokerage houses.

enjoining each Defendant from directly or indirectly participating in the issuance, purchase, offer, or sale of any security; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities in interstate commerce, or the mails.  For example, retail investors residing within this District purchased stock in each of the Issuers, which are discussed below; shares in virtually all of the Issuers discussed below were, in furtherance of the scheme, delivered to custodial firms headquartered within this District; and virtually all wire transfers in furtherance of the scheme passed through banks headquartered in this District.

## DEFENDANTS

11.     **Ronald Bauer a/k/a Ronald J. Bauer and Ronald Jacob Bauer ("Bauer")**, age 47, is a citizen of Canada and the United Kingdom, and is believed to be residing in the United Kingdom.  As detailed below, Bauer oversaw and coordinated virtually every aspect of every penny stock fraud perpetrated by the various groups he led.  Bauer undertook the acts alleged herein after the February 2006 entry of a final judgment against him, by consent, in the settlement of an SEC enforcement action involving a similar penny stock fraud scheme.  *See SEC v. Bauer*, No. 05-cv-0426 (N.D. Tex., filed March 2, 2005).

12.    **Craig James Auringer ("Auringer")**, age 51, is a Canadian citizen believed to be residing in the United Kingdom.  As detailed below, Auringer's primary role was arranging promotional campaigns touting various stocks, including, since around 2010, overseeing such promotional activity through Kambeitz.  Auringer also used offshore omnibus vehicles and front companies to conceal the fact that he was the beneficiary of illegal stock sales, and failed both to disclose his beneficial ownership and trading and to register his stock sales as legally required.

13.    **Alon Friedlander ("Friedlander")**, age 49, is a German citizen believed to be residing in the United Kingdom.  As detailed below, his roles included identifying purported petroleum, mineral and other interests to ultimately exploit through Bauer Ring pump-and-dumps, as well as to advance funds to cover expenses and to direct the corporate actions of various Issuers during such frauds.  Friedlander also used offshore omnibus vehicles and front companies to conceal the fact that he was the beneficiary of stock sales, and failed both to disclose his beneficial ownership and trading and to register his stock sales as legally required.

14.    **Massimiliano "Max" Pozzoni Lundie ("Pozzoni")**, age 46, is a dual citizen of Italy and Chile believed to be residing alternately between the United Kingdom and Spain. Initially, Pozzoni served as a complicit figurehead officer/director of various Issuers whose stock was the subject of fraudulent Bauer Ring pump-and-dumps, including at least one – True North Energy Corp. – from which he secretly received at least $2 million in stock sale proceeds in a Swiss bank account he controlled.  Pozzoni also used offshore omnibus vehicles and front companies to conceal the fact that he was the beneficiary of stock sales, and failed both to disclose his beneficial ownership and trading and to register his stock sales as legally required.

15.    **Daniel Mark Ferris ("Ferris")**, age 40, is a citizen of the United Kingdom believed to be residing in Monaco.  Like Pozzoni, Ferris initially served as a complicit

figurehead officer/director of various issuers (including Lone Star Gold and Virtus Oil & Gas) whose stocks were the subject of Bauer Ring pump-and-dumps.  In 2019, Ferris perpetrated his own penny stock pump-and-dump (Blue Eagle Lithium) that was halted by a Commission trading suspension.  Ferris committed virtually all of his acts encompassed by this Complaint after the Commission, in 2013, suspended trading in one of the stocks (Polar Petroleum) that was the subject of a fraud perpetrated with Bauer.  Like others, Ferris used offshore omnibus vehicles and front companies to conceal that he was the beneficiary of stock sales, and failed both to disclose his beneficial ownership and trading and to register his stock sales as legally required.

16.     **Petar Dmitrov Mihaylov ("Mihaylov")**, age 42, is a Bulgarian citizen believed to be residing in Bulgaria.  As detailed below, he partnered with the Bauer Ring on at least two fraudulent pump-and-dumps – Steampunk Wizards Inc. and Cantabio Pharmaceuticals Inc. – and perpetrated at least one pump-and-dump (Lifelogger Technologies Corp.) apart from Bauer.  Mihaylov engaged in the conduct described herein after the September 2012 entry of a final judgment against him, by consent, in the settlement of an SEC enforcement action involving a similar penny stock fraud.  *See SEC v. Homeland Safety International Inc. et al.*, No. 08-cv-1187 (N.D. Tex., filed July 15, 2008).  Like others, Mihaylov used offshore omnibus vehicles and front companies to conceal that he was the beneficiary of stock sales, and failed both to disclose his beneficial ownership and trading and to register his stock sales as legally required.

17.     **David Sidoo ("Sidoo")**, age 62, is a Canadian citizen believed to be residing in Canada.  For at least eight years during the 1990s, Sidoo worked as a stockbroker in Vancouver, British Columbia, Canada.  As detailed below, he joined in perpetrating at least two Sidoo & Bauer Ring Coalition frauds (North American Oil & Gas Corp. and American Helium Inc.). Like others, Sidoo used offshore omnibus vehicles and front companies to conceal the fact that

he was the beneficiary of stock sales, and failed both to disclose his beneficial ownership and trading and to register his stock sales as legally required.

18. **Adam Christopher Kambeitz ("Kambeitz")**, age 47, is a Canadian citizen believed to be residing in the Cayman Islands.  A subordinate member of the Bauer Ring, Kambeitz's role, since 2010, was to arrange materially misleading promotional campaigns for various issuers that were the subject of Bauer Ring and Sidoo & Bauer Ring Coalition pump-and-dumps.  To that end, Kambeitz routinely established and retired various different offshore front companies that each served as the purported paying party for promotional campaigns. Kambeitz also engaged in inherently deceptive conduct in furtherance of the scheme that included (a) routing payments to media companies through two different offshore accounts he controlled and (b) making material misrepresentations to foreign banks.

## **RELATED PARTIES**

### I.    **ISSUERS USED AS INSTRUMENTS FOR THE FRAUDS DESCRIBED HEREIN**

19. **Virtus Oil & Gas Corp.** (CIK 0001478725), known as Curry Gold Corp until August 2013 ("**Virtus Oil & Gas**" or "**Virtus**"), was at all relevant times a Nevada corporation headquartered in Los Angeles, California purportedly in the business of acquisition and exploration of oil and gas properties in Utah and other western states.  The company filed a Form 8-A12G on October 17, 2011 to register its common stock under Exchange Act Section 12(g). On April 26, 2019, the Commission issued an order revoking that registration.  Virtus's securities were quoted on OTC Link[3] under the symbol "VOIL," and it filed periodic reports with the Commission, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a).

---

[3] OTC Link is an interdealer quotation, messaging, and trading system for broker-dealers provided by OTC Link LLC, a wholly-owned subsidiary of OTC Markets Group.

20.     **North American Oil & Gas Corp.** (CIK 0001515635), known as Calendar Dragon Inc. until November 2012 ("**North American Oil**"), was at all relevant times a Nevada Corporation headquartered in Ventura, California, purportedly in the business of acquisition and exploration of oil and gas properties in California.  The company filed a Form 8-A12G on December 6, 2012 to register its common stock under Exchange Act Section 12(g).  On October 4, 2017, the Commission issued an order revoking that registration.  North American Oil's securities were quoted on OTC Link under the symbol "NAMG," and it filed periodic reports with the Commission, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a).

21.     **American Helium Inc.** ("**American Helium**") was at all relevant times a Canadian corporation headquartered in Vancouver, British Columbia, Canada, purportedly in the business of exploring for and developing helium assets in Utah.  The company's common stock has been quoted on the OTC Link under the symbol "AHELF," and it has had five market makers, all headquartered in New York City.

22.     **Steampunk Wizards Inc.** (CIK 0001557798), known as Freedom Petroleum Inc. until July 2015, and known as Tianci International Inc. since November 3, 2016 ("**Steampunk**"), is a Nevada corporation headquartered in Los Angeles, California that, at all relevant times, was purportedly in the business of developing games and gaming technology.  Steampunk's securities were quoted on OTC Link under the symbol "SPWZ," and it filed periodic reports with the Commission, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a).

23.     **Polar Petroleum Corp.** (CIK 0001520320), known as Post Data Inc. until October 2012 ("**Polar**"), was at all relevant times a Nevada corporation headquartered in Anchorage, Alaska, purportedly in the business of oil and gas exploration, development and production in the state of Alaska.  Polar's securities were quoted on OTC Link under the symbol

"POLR," and it filed periodic reports with the Commission, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a).  On June 10, 2013 – while Bauer's and Ferris's Polar fraud was ongoing – the Commission issued an order suspending trading in Polar's stock.

24.     **Lifelogger Technologies Corp.** (CIK 0001567771), known as Snap Online Marketing Inc, until December 2013 ("**Lifelogger**"), was at all relevant times a Nevada Corporation headquartered in Palm Beach Gardens, Florida, purportedly in the business of providing an "enhanced media experience for consumers by augmenting videos, livestreams and photos with additional context information and providing a platform that makes it easy to find and use that data when viewing or sharing media."  The company filed a Form 8-A12G on September 4, 2015 to register its common stock under Exchange Act Section 12(g).  Lifelogger's securities were quoted on OTC Link under the symbol "LOGG," and it filed periodic reports with the Commission, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a).

25.     **Blue Eagle Lithium Inc.** (CIK 0001557668), known as Wishbone Pet Products Inc. until May 2018 ("**Blue Eagle**"), was at all relevant times a Nevada Corporation headquartered in Henderson, Nevada, purportedly in the business of acquisition and development of early-stage lithium exploration opportunities in Nevada.  The company filed a Form 8-A12G on February 23, 2016 to register its common stock under Exchange Act Section 12(g).  Its securities were quoted on OTC Link under the symbol "BEAG," and it filed periodic reports with the Commission, including Forms 10-K and 10-Q, pursuant to Exchange Act Section 13(a).  On July 1, 2019, the Commission issued an order suspending trading in Blue Eagle's stock.

## II.     OFFSHORE PLATFORMS

26.     **Blacklight S.A.**  ("**Blacklight**") was, from 2010 through 2019, a financial services firm headquartered in Geneva, Switzerland that actively specialized in depositing and

liquidating stock through various foreign brokerage firms.  Apart from Sidoo, each of the

Defendants was a Blacklight client, who used Blacklight-administered vehicles for securities

trading, money movements, or both, relating to most of the frauds described herein.

27.     As used herein, the "**Asia Platform**" refers to a collection of nine omnibus

vehicles that had banking and trading accounts in Hong Kong, China and/or Singapore, all

administered by Canadians Steve Mako Bajic and Rajesh Taneja, and that specialized in

depositing and liquidating stock.[4]  By 2015, Blacklight ran portions of its clients' (including the

Bauer Ring's) penny stock frauds through the Asia Platform, with the two platforms sharing in

the resulting commissions.

28.     As used herein, "**Swiss Platform No. 1**" refers to two affiliated financial services

firms headquartered in Zurich, Switzerland and St. Ouen, Isle of Jersey, which specialized in

depositing and liquidating stock and operated from at least 2011 until at least late 2017 (when

one of its principals was enjoined in a Commission enforcement action).[5]  All members of the

Bauer Ring were Swiss Platform No. 1 clients, who used vehicles administered by Swiss

Platform No. 1 for securities trading, money movements, or both, in connection with the pump-

and-dumps alleged herein.  Although Swiss Platform No. 1 generated dozens of front company

names that its clients (including the Bauer Ring) used as nominal holders of stock certificates, all

---

[4] On January 2, 2020, the SEC filed suit against (among other defendants) Bajic, Taneja, and eight of the companies comprising the Asia Platform.  *SEC v. Bajic et al.*, Lit. Rel. No. 24712/Jan. 10, 2020.  Final judgments have since been entered against Taneja and each of the Asia Platform entity defendants.

[5] The respective principals of the two firms comprising Swiss Platform No. 1, Daniel Lacher and Wayne Weaver, were named in Commission enforcement actions for securities fraud and other violations.  Weaver was sued on November 17, 2015 (*SEC v. Jammin Java Corp et al*, Civil Action No. 2:15-cv-08921 (C.D. Cal. Filed Nov 17, 2015)); Lacher was sued on November 17, 2018 (*SEC v. Morrie Tobin et al*, Civil Action No. 1:18-cv-12451 (D.Mass. filed Nov 27, 2018)).  A final judgment imposing permanent injunctions and a penny stock bar against Weaver, and ordering him to pay monetary remedies totaling $57 million, was entered on October 2, 2017 and, on May 8, 2019, affirmed on appeal.  *See SEC v. Wayne S.P. Weaver et al.* No. 17-56423 (9th Cir. May 8, 2019).  The Commission's case against Lacher remains pending.

such stock was ultimately deposited and sold through a Swiss Platform No. 1-administered omnibus vehicle named **Alabron Capital Corp** (which was called **Vantage Securities Inc**. until June 18, 2014) (hereinafter "**Vantage/Alabron**").  For money movements, Swiss Platform No. 1 used at least three omnibus vehicles:  **Vantage/Alabron, Provido Ventures Inc**. ("**Provido**"), and **Blue Leaf Capital Ltd** ("**Blue Leaf Capital**").

29.     As used herein, "**Swiss Platform No. 2**" refers to a financial services firm headquartered in Geneva, Switzerland that specialized in depositing and liquidating stock and operated from at least 1998 until at least August 2016.  At least five members of the Bauer Ring (Bauer, Auringer, Friedlander, Pozzoni and Ferris), plus Sidoo, were clients of Swiss Platform No. 2, from as early as 2004 onward, and each used vehicles administered by it for securities trading, money movements, or both, in connection with the pump-and-dumps detailed herein.

30.     As used in this Complaint, "**Swiss Platform No. 3**" refers to a financial services firm headquartered in Zurich, Switzerland that specialized in depositing and liquidating stock and operated from at least 1998 until January 2017.  At least four members of the Bauer Ring (Bauer, Auringer, Friedlander and Pozzoni) were clients of Swiss Platform No. 3 from as early as 2006 onward, and each used vehicles administered by it for securities trading, money movements, or both, in connection with many of the pump-and-dumps detailed herein.

## FACTS

### I.     BACKGROUND

####     A.     Statutory Framework Concerning the Sale of Securities: Control Persons, Restrictions on Sales, and Issuer Disclosure Requirements

31.     Stock of a public company, held by control persons of that company, cannot generally be offered or sold to the public without being first registered with the Commission or without complying with various public disclosure requirements and limits on the amount of stock

that can be sold.  These legal requirements create market transparency by giving investors access to material information, including information identifying: from whom the investors would be buying stock, the control persons of the company, and what those control persons are doing with their own stock.

32.     For example, before such stock can be publicly sold, the person issuing or selling the stock must either (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) rely on an exemption from registration; or (c) comply with the sale conditions outlined in Commission Rule 144, which provides a safe harbor for selling unregistered stock.  *See* 15 U.S.C. §§77d, 77e; 17 C.F.R. §230.144., including limitations on the amount of stock a control person can legally sell.

33.     In addition, for companies whose securities are registered under Section 12 of the Exchange Act, investors owning 5% or more of the company's publicly traded stock are required to publicly  disclose their ownership interest, while investors owning 10% or more are required to publicly  disclose all of their trading in that stock, regardless of quantity.  Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, to inform investors about the nature of the stock they are holding or considering buying, and to alert investors when control groups, affiliates, or major shareholders sell their shares.

34.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company.  Affiliates include officers, directors and controlling shareholders, as well as any

13

person who is under "common control" with or has common control of an issuer.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

35.     "Restricted stock" includes stock of a publicly traded company (also known as an issuer) that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  All stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also includes identification of any person or group who is the beneficial owner of more than 5% of the company's securities.

36.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement.  Registration statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  When a control person buys publicly-traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate.  Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

37.     A "transfer agent" is a business that facilitates certain types of securities transactions.  Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether particular shares are restricted from resale.

38.      "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

39.     "S-1 Registration Statement(s)" refer(s) to SEC Form S-1, a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders.  "S-1 Shareholders" means shareholders who acquired stock pursuant to an S-1 Registration Statement.

40.     A "DTC eligible" security is one that is freely tradeable, fungible, and qualified to be held at the Depository Trust Company (DTC) and traded and serviced through DTC's electronic book-entry system, thereby rendering it rapidly tradeable.

**B.     At All Times Defendants Knew of the Relevant Prohibitions Against Securities Fraud and Unregistered Securities Offerings**

41.     The Defendants engaged in the multi-year pump and dump penny stock fraud scheme described herein despite their awareness of the applicable federal securities laws it violated and despite, along the way, repeatedly being confronted with "red flag" reminders of its illegality.  For example, even before committing the respective frauds detailed herein, Bauer and Mihaylov had each been named in similar Commission penny stock fraud enforcement actions, and each had been permanently enjoined, by consent, against like misconduct in the future. Those injunctions specifically proscribed future violations of the antifraud and securities registration provisions of the federal securities laws and, for Bauer, also proscribed future violations of the beneficial ownership and insider transactions reporting provisions.  For his part,

Sidoo had worked for eight years as a stockbroker (and, as such, had significant exposure to, and therefore awareness of, the federal securities laws' antifraud, registration, beneficial ownership reporting and insider transaction reporting provisions), while Ferris and Pozzoni had served as public company officers/directors and filed beneficial ownership and insider transaction reports, as had Bauer.

42.     Also, during the course of the scheme, at least one Bauer Ring fraud (Sovereign Lithium in November 2013, in which the full Ring, including Kambeitz, participated), and one Bauer-Ferris fraud (Polar Petroleum in June 2013) were halted by Commission-imposed trading suspensions.  In addition, several of the Offshore Platforms and foreign brokerage houses through which the Defendants perpetrated their frauds were, at various points in time during the scheme, shut down or severely restricted by a variety of criminal or civil authorities.

## II.     THE DEFENDANTS' PUMP AND DUMP SCHEME

### A.     Overview of the Scheme

43.     Since at least 2006, various combinations of the Defendants have engaged in illegal pump-and-dumps of at least seventeen different U.S. quoted penny stock companies. While the names, locations, and details of the individuals and entities involved changed over time, the essential nature of each of the pump-and-dumps followed a similar pattern in which Defendants, through an array of foreign alter ego front companies and omnibus vehicles, effected some or all of the following: (i) funded each issuer; (ii) controlled virtually all free-trading shares of each issuer; (iii) arranged and funded misleading promotional campaigns touting each stock; (iv) sold massive quantities of each stock into the price and demand rises triggered by those campaigns; and (v) reaped illicit gains through, among other devices,

circuitous transfers of money covered by bogus documentation.  Five representative examples, of the at least seventeen illegal pump-and-dumps alleged by this Complaint, now follow.

**B.      Example One: The Bauer Ring's Virtus Oil & Gas (VOIL) Fraud**

44.      Virtus Oil & Gas ("VOIL") provides one illustrative example of the pattern of illegal conduct followed in all the various penny stock pump and dump schemes executed by the Bauer Ring.  The Ring's first step in the scheme was to identify a shell company issuer and gain control both of its management and of its purportedly free trading stock.  Then comprised of Bauer, Auringer, Friedlander, Pozzoni and Ferris, with Kambeitz in a subordinate role, the Bauer Ring worked in concert to execute the first and all subsequent steps in this pump-and-dump.

**i.      Acquiring the Issuer and Gaining Control of Its Management and Stock**

45.      On or about July 5, 2012, the Bauer Ring, acting through Ferris, purchased two million shares of a company named Curry Gold Corp. ("Curry Gold"),[6] representing approximately 60% of the outstanding shares of the company, from the company's then President and sole director, for 2½ cents per share, for a total cost of $50,000.  The Bauer Ring thereby gained operational control of the Curry Gold (and at or about the same time acquired the remainder of the company's outstanding shares).  The next day, July 6, Ferris became Curry Gold's President, Secretary and Treasurer, and on July 17, 2012, became its sole director.

46.      Curry Gold had been incorporated in Nevada in 2009, had 3.35 million shares outstanding, and had (in December 2010) been cleared by FINRA to be quoted on OTC Markets and was DTC eligible (defined at ¶ 40 above), and its unlegended shares, thereby, could be passed off as unrestricted.  Of Curry Gold's 3.35 million outstanding shares, 2.05 million were

---

[6] Curry Gold described itself as a "development stage company… capitaliz[ing] on the growing trend of food to go (convenience food) with its Currywurst product, a product native to Germany" consisting of "hot pork sausage… cut into slices and seasoned with curry sauce."

restricted; and the remaining 1.3 million shares had been issued without restricted legends[7]
pursuant to a registration statement which the issuer had filed with the Commission on January 6,
2010, and that the Commission had declared effective on July 19, 2010.

### ii.   Changing Name, Ticker, Business Plan and Number of Shares

47.     The Bauer Ring then arranged for Curry Gold to merge with a private company
that had a business plan that would be appealing to penny stock investors.  The vehicle it chose
was Virtus Oil & Gas.  In August 2013, Ferris, acting for the Ring, effected a corporate
transformation in which Curry Gold:  (i) changed its name on August 30, 2013 to "Virtus Oil &
Gas Corp." and later its ticker symbol to VOIL; (ii) effected a 14:1 forward stock split meaning
that every share of Curry Gold became 14 shares of VOIL; and (iii) shifted its purported business
focus from a food product to oil and gas exploration.  As a result of the stock split, Curry Gold's
3.35 million shares became 46.9 million shares of Virtus Oil & Gas, with 18.2 million of those
shares being unrestricted.

48.     Ferris continued to serve in all key management roles for Virtus  (specifically as
its President, CEO and sole Director) until about May 13, 2014, when he was succeeded by an
associate ("Figurehead A") whom he had recruited, and whose corporate actions he (and through
him, the Bauer Ring) continued to direct.[8]

### iii.   Positioning Virtus Oil & Gas's Shares for Unloading in the Market

49.     On paper, the post-split 18.2 million unrestricted Virtus shares covered by the S-1
were issued to twenty-two individual Swiss residents.  Since at least July 2012, however (as

---

[7] Restrictive legends are notations on a certificate representing securities (the stock certificate or note) that describe
prohibitions, restrictions, or conditions on the transfer of the securities. Securities intermediaries such as transfer
agents will not transfer a security in violation of its restrictive legend. Shares issued without restrictive legends are
commonly treated by securities brokers and transfer agents as immediately and freely tradeable.

[8] Figurehead A would later serve as purported CEO of another Issuer, Blue Eagle Lithium, Inc., which was the
subject of a pump-and-dump described below that Ferris conducted after departing the Bauer Ring.

noted in ¶ 45 above), all 18.2 million of those shares – as well as the company's restricted shares – were, in reality, controlled by the Bauer Ring.

50.    Between September 9, 2013 and July 8, 2014, the Bauer Ring positioned all 18.2 million of Virtus 's purportedly free trading shares, in tranches of less than 5%, to be sold to unsuspecting investors through multiple Offshore Platforms.  To accomplish this, Virtus's CEO (first Ferris and later Figurehead A at Ferris's direction), acting on behalf of the Bauer Ring signed, directives to the Virtus's transfer agent to cancel various less-than-5% groupings of the individual share certificates covered by the S-1, reissue them in the names of various front companies, and send the shares to various custodial firms, most of which were located in this District.  For example, one such front company receiving Virtus shares at Ferris' direction was a Cyprus-domiciled company, Woolwich Holdings, Ltd., which received 2.1 million (or 4.28% of the company's outstanding) shares; Woolwich was straw-owned, for Bauer's benefit, by a Bauer relative ("Bauer Relative A").  Ferris, and later Figurehead A, also signed – again as the company's CEO – transfer agent indemnifications concerning each of these issuances.  A transfer agent indemnification provides that the issuer irrevocably agrees to make the transfer agent whole for any loss, liability or expense in carrying out the requested issuance.

51.    By early July 2014, all 18.2 million of Virtuss purportedly unrestricted shares had been allocated among various Offshore Platform-administered front companies and omnibus vehicles and positioned for unloading into the market, as follows:

| Front Company / Omnibus Vehicle | # of Shares | % of all Shares | Offshore Platform | Date Positioned |
|---|---|---|---|---|
| Brokerage Firm A | 1.4 million | 2.85% | Swiss Pl. #2 | 9 Sep 2013 |
| Woolwich Holdings Ltd‡ | 2.1 million | 4.28% | Swiss Pl. #2 | 4 Dec 2013 |
| Rhodeswell Investments Ltd | 2.1 million | 4.28% | Swiss Pl. #2 | 4 Dec 2013 |
| Fiesta Investments Ltd | 0.7 million | 1.42% | Swiss Pl. #1 | 30 Jan 2014 |
| Fiesta Investments Ltd | 0.7 million | 1.42% | Swiss Pl. #1 | 7 Feb 2014 |
| Rosefairy Finance Ltd* | 1.4 million | 2.85% | Swiss Pl. #1 | 7 Feb 2014 |

| Front Company / Omnibus Vehicle | # of Shares | % of all Shares | Offshore Platform | Date Positioned |
|---|---|---|---|---|
| Brickets Capital Ltd | 1.4 million | 2.85% | Swiss Pl. #1 | 7 Feb 2014 |
| Nessa Ventures Ltd | 1.4 million | 2.85% | Swiss Pl. #1 | 7 Feb 2014 |
| Swiss Bank A | 2.1 million | 4.28% | Swiss Pl. #3 | 26 Feb 2014 |
| Waterfall Group Investments‡ | 2.1 million | 4.28% | Swiss Pl. #2 | 3 July 2014 |
| World Time Ltd‡ | 1.4 million | 2.85% | Blacklight | 8 July 2014 |
| Alveston Partners Inc‡ | 1.4 million | 2.85% | Blacklight | 8 July 2014 |
| **TOTAL** | **18.2 million** | **37.1%** | | |

*\* Rosefairy Finance Ltd was a Swiss-banking, Swiss Platform #1-administered front company linked to Auringer.*

‡*Woolwich, Waterfall, World Time and Alveston, each of which had a straw owner, were all de facto controlled by Bauer.*

52.     The Virtus shares detailed in the above table represented over 37% of the company's outstanding stock, and fully 100% of its purportedly unrestricted stock.  All of these shares had been issued without restrictive legend.   Yet, in reality, every one of these shares were controlled by the Bauer Ring, all members of which, because of their concerted control of the shares, were affiliates of the Issuer.

53.     Because these shares were controlled by Bauer, Auringer, Friedlander, Ferris and Pozzoni, who together and separately were affiliates of Virtus, as a matter of law, the purportedly "unrestricted" shares were in fact restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.

54.     By having their Virtus shares allocated in multiple different tranches, each of which fell below 5% of the company's total outstanding shares, to various nominee shareholders and omnibus vehicles administered by various Offshore Platforms, Defendants Bauer, Auringer, Friedlander, Ferris and Pozzoni created the false appearance – deceiving Virtus's transfer agent, the nominee entities' brokerage firms, investors, and other market participants – that multiple different, unrelated offshore corporate entities each held less than 5% of Virtus's stock.  In reality, those offshore entities' Virtus shares were all under common control by the Bauer Ring.

55.     Because Virtus's securities had, since 2011, been registered under Section 12 of the Exchange Act, the beneficial-ownership and insider-transactions-reporting provisions of the federal securities laws applied to holders of its securities.  These provisions required beneficial owners of greater than 5% of Virtus's common stock to disclose, via a Schedule 13D filing with the Commission, their ownership, as well as any agreements they had entered into concerning the disposition of Virtus's securities and, further, to promptly file a 13D amendment whenever their ownership percentage materially changed.  These provisions also required greater than 10% beneficial owners of a stock to file with the Commission a Form 4 promptly reporting any change in ownership, regardless of amount.

56.     Despite being beneficial owners of well over 10% – indeed, fully 100% – of Virtus's securities, Defendants Bauer, Auringer, Friedlander and Pozzoni never made a single 13D or Form 4 filing with the Commission.

57.     For his part, Ferris, although he did make a few 13D and Form 4 filings regarding Virtus, those filings were materially false and misleading.  Ferris never disclosed in any 13D filing, for example, that he was beneficial owner of the massive number of shares he held and traded in concert with the Bauer Ring; and he never filed any Form 4 reflecting sales of Virtus stock that had been sold on his behalf, directly or indirectly, by the Bauer Ring.

### iv.    Orchestrating the Promotion of Virtus Oil & Gas Stock

58.     Meanwhile, as Virtuss purportedly free-trading stock was being positioned to be sold, the Bauer Ring designed and funded a promotional campaign urging investors to buy Virtus stock.  To execute this campaign, the Bauer Ring enlisted Kambeitz, who served as the point of contact with media firms through which promotions were disseminated.

59.     As an initial step in that effort, in October 2013, Kambeitz established a new offshore front company, Yxime Partners Ltd ("**Yxime**"), which he caused to be incorporated in Belize, and which was to be misleadingly identified in the promotional materials as the purported paying party for those promotions.  By January 2014, Kambeitz opened an account for Yxime at a Cyprus Bank ("**Cyprus Bank A**"), identifying himself as the account's owner.

60.     On January 30, 2014, Yxime's account received its first deposit:  a $140,000 wire from Vantage/Alabron.  This wire was funded by proceeds from the Bauer Ring's then-ongoing pump-and-dump of another penny stock, Bison Petroleum Corp (ticker BISN).  As alleged in ¶ 28 above, Vantage/Alabron was the omnibus trading vehicle of Swiss Platform #1 and also served as one of at least three Swiss Platform #1 omnibus vehicles for money movements. [9]  The Bauer Ring used Vantage/Alabron in every one of its pump-and-dump schemes detailed herein.

61.     Beginning in February 2014, Kambeitz began using Yxime to fund the launch of the Virtus promotional campaign by wiring money to U.S.-based media companies.  Over the next ten months, as this promotional campaign continued, Kambeitz caused Yxime to wire a total of over $6.4 million to various U.S.-based media companies that provided mass-dissemination and other services in connection with that campaign.  These wires – like virtually all other wires referenced in this Complaint – passed through banking facilities located in this District.

62.     Yxime was not the true paying party for the Virtus promotional campaign, however.  Instead, as detailed below, Yxime was merely a pass-through vehicle for funding supplied by a combination of (i) the $140,000 in proceeds from a prior Bauer Ring pump-and-dump (that of Bison Petroleum), as noted in ¶ 61 and n.8 above, (ii) $1.45 million contributed by other Bauer Ring Members (specifically Bauer, Auringer, Friedlander and Pozzoni), and (iii)

---

[9] Between November 30, 2013 and January 29, 2014, Vantage/Alabron had sold at least 324,500 shares of Bison Petroleum, for proceeds totaling approximately $239,000.

over $5 million in proceeds from the Bauer Ring's sales, through Swiss Platform #1, of the very stock being promoted, Virtus Oil & Gas.

63.     Nor was Yxime the only pass-through vehicle used in funding the Virtus promotional campaign.  To obscure the campaign's funding sources even more, Kambeitz, acting for the Bauer Ring, established a *second* pass-through vehicle, through which nearly all the campaign's funding first passed before being forwarded to Yxime, and by it to U.S.-based media companies.  This vehicle, which Kambeitz also owned, was a Swiss corporation called **Adairius SA** ("**Adairius**"), for which Kambeitz caused to be established a Blacklight-administered bank account at a Liechtenstein bank ("**Liechtenstein Bank A**").

64.     Adairius received all $1.45 million of the Virtus promotional funds contributed by Bauer, Auringer, Freidlander and Pozzoni (referenced in ¶ 62 above) before forwarding them to Yxime.  For their part, Bauer, Auringer, and Friedlander each made their Virtus promotional contributions directly to Adairius from one of their own respective front companies, while Pozzoni first routed his front company's contribution through Swiss Platform #1.  The chart below summarizes these Virtus promotional payments by Bauer Ring Members:

| Date | Amount Sent to Adairius | Originating Party (Front Company) |
|------|------------------------|-----------------------------------|
| 17 June 2014 | $261,000 | Aquila Assets Inc. (Auringer) |
| 18 June 2014 | $130,500 | Malive A SA ("Malive") (Friedlander) |
| 30 June 2014 | $59,000 | Marina Capital Inc.(Pozzoni) via Blue Leaf Capital* |
| 1 July 2014 | $300,000 | Malive (Friedlander) |
| 18 July 2014 | $350,000 | World Time (Bauer) |
| 31 July 2014 | $100,000 | World Time (Bauer) |
| 8 August 2014 | $250,000 | World Time (Bauer) |
| **Total** | **$1,450,500** | |

*As noted in ¶ 28 above, Blue Leaf Capital was a money-movement omnibus vehicle of Swiss Platform #1.*

65.     As the promotional campaign ran, the Bauer Ring sold its Virtus stock into the demand rise created by the campaign and applied over $5 million of the proceeds toward funding

the ongoing campaign.  The proceeds so applied came from the Bauer Ring's Virtus stock sales

through Swiss Platform #1, with $4.3 million being paid from Vantage/Alabron to Adairius

(which, in turn, paid them over to Yxime), and $1.25 million more being paid from

Vantage/Alabron and Provido to Yxime directly.  Yxime, in turn, wired over $6.4 million to the

multiple U.S. media companies handling the Virtus promotional campaign.

66.     The following graphic illustrates the funding of the Virtus promotion, as

described in ¶¶ 61-66 above:



### v.     Kambeitz Makes False and Misleading Statements Regarding the Funding of the Virtus Promotional Campaign

67.     As the transactions to fund the Virtus promotional campaign were underway, anti-

money laundering compliance officials, both at **Cyprus Bank A** (which held Yxime's account)

and at **Liechtenstein Bank A** (which held Adairius' account), began to ask questions about the

nature of these transactions.  As the beneficial owner of both accounts, Kambeitz responded to

these queries, doing so directly, in the case of Cyprus Bank A, and by supplying the "answers" to Blacklight, in the case of Liechtenstein Bank A.  These answers in both cases were materially false and misleading, as well as inconsistent with each other.

68.     For example, in response to Cyprus Bank A's inquiries, Kambeitz identified Yxime's client for the Virtus project as *Adairius*.  But to Liechtenstein Bank A (which knew that Kambeitz owned Adairius), Kambeitz, through Blacklight, identified Yxime's client for the Virtus project as *Vantage/Alabron*.  Both answers were materially false and misleading because, as Kambeitz well knew, the Bauer Ring was the true party behind the Virtus campaign.

69.     In response to Liechtenstein Bank A's request for a "detailed description why Adairius transfers funds to Yxime, though both companies have the same BO [beneficial owner,] and why [Vantage/]Alabron [the purported client] doesn't send the funds directly to Yxime," Kambeitz, through Blacklight, gave the materially false and misleading explanation that this was necessary in order to protect Kambeitz's media contacts from becoming known to Vantage/Alabron, which "could compromise [Kambeitz's] ability to generate long-term business."  But, as Kambeitz knew, Vantage/Alabron *did* wire funds directly to Yxime, including at least $550,000 to Yxime's account at Cyprus Bank A, and $200,000 to Yxime's account at a second Cyprus Bank (Cyprus Bank B) after its account at Cyprus Bank A was closed.

**vi.    The Virtus Promotional Materials Were False and Misleading**

70.     The Virtus promotional materials that Kambeitz arranged urged readers to buy the stock and do so quickly, to capitalize on supposedly realistic prospects of near-term, dramatic gains.  A 21-page promo disseminated in July 2014, for example, urged investors to "BUY VOIL NOW!" claiming that "VOIL has quietly secured the sweet spot within [Utah's Central Overthrust Belt] formation and is closing in on the next major U.S. petroleum discovery," and

adding, "**RIGHT NOW** … is that crucial moment in your lifetime where you step up to the plate and secure an early position in **VOIL** before the pending payoff!"  (Emphasis in original).  These statements were materially misleading for, among other reasons, they omitted to disclose material facts, including that the parties behind the statements – the Bauer Ring members – did not believe the statements, as evidenced by their simultaneous, and massive, trading in the opposite direction as they collectively sold their stock during the campaign.

71.     Per Kambeitz's instructions to media companies, the Virtus promotional materials consistently identified Yxime as the promotions' purported paying party.  This representation was false and materially misleading too, as in fact, Yxime was merely a pass-through entity for funding that was provided by the Bauer Ring, who controlled literally all of the company's free-trading shares and were therefore affiliates of the Issuer.

### vii.   The Bauer Ring Massively Dumps Its Virtus Stock

72.     The Bauer Ring's Virtus promotional campaign was attended by dramatic rises in demand for Virtus stock, as well as its share price.  The Bauer Ring took full advantage of these price and demand increases.  Between February 28, 2014 and January 29, 2015, through three of the Offshore Platforms (Swiss Platform #1, Swiss Platform #2 and Blacklight), the Bauer Ring sold at least 15.925 million shares, for illicit proceeds of approximately $23.1 million.

73.     The Bauer Ring then collected their Virtus proceeds via furtive means.  As to the proceeds it realized through the Blacklight platform (which netted approximately $4.71 million after expenses), the Ring split them four ways, with Bauer, Auringer and Friedlander each receiving a 29% distribution, and the remaining 13% going to Pozzoni.  These distributions were sent primarily from Bauer's straw-owned World Time account, often directly to one of the

respective Ring member's offshore fronts, and under cover of bogus documentation.  The table

below provides a non-exhaustive illustration of these distributions:

| Date | Amount | Front Company Recipient | Beneficial Owner | Bogus Explanation |
|---|---|---|---|---|
| 30 Sep 2014 | $130,000 | Eternity Resources SA | Pozzoni | Consulting fees |
| 6 Oct 2014 | €407,000 ($518,000) | Rosefairy Finance Ltd | Auringer | Consulting re real estate projs in Asia + S. Amer. |
| 14 Oct 2014 | $290,000 | Malive A, SA | Friedlander | Consulting re real estate investment in Macau |
| 22 Oct 2014 | $580,000 | Malive A, S.A. | Friedlander | Services re projects in Macau |
| 4 Nov 2014 | $260,000 | Eternity Resources SA | Pozzoni | Cash call re Alberta, Canada oil well |

While the invoices and accompanying documentation referenced in the above table stated these

payments were for consulting services relating to particular real estate projects (in the case of

Auringer and Friedlander), and for consulting fees and a cash call relating to a particular Alberta,

Canada oil well (in the case of Pozzoni), each of these explanations was entirely untrue.  In fact,

each payment in the table was a distribution of illicit VOIL stock-sale proceeds; and VOIL had

nothing whatever to do with any Asian or South American real estate or any Alberta oil wells.

74.     Bauer reaped his share of the Virtus proceeds the Ring had generated through

Blacklight-administered accounts primarily via purported "loans" from World Time to himself

("loans" that, as a rule, were never repaid), as well as World Time payments to various service

providers to Bauer.  This table provides a non-exhaustive illustration of such distributions:

| Date | Amount | Originator | Recipient | Description or Purpose |
|---|---|---|---|---|
| 3 Oct 2014 | $100,000 | World Time Ltd | Bauer | "loan" |
| 10 Oct 2014 | $103,000 | World Time Ltd | Caribbean Resort A | Bauer Holiday & Travel |
| 28 Oct 2014 | $50,000 | World Time Ltd | Bauer | "Part of loan agreement" |
| 31 Oct 2014 | $50,000 | World Time Ltd | Bauer | "Part of loan document" |
| 7 Nov 2014 | $40,000 | World Time Ltd | Bauer | "Part of loan document" |
| 26 Feb 2015 | $32,700 | World Time Ltd | Travel Agency A | Bauer Holiday & Travel |

75.   Ferris likewise shared in the Bauer Ring's Virtus stock sale proceeds, including by receiving such proceeds from Swiss Platform #1 omnibus vehicles.  These distributions included the following wires to Ferris's personal bank accounts in Monaco:

| Date | Amount | Sender |
|------|--------|--------|
| 13 Nov 2014 | $40,000 | Vantage/Alabron |
| 19 Nov 2014 | $30,000 | Provido |
| 2 Dec 2014 | $30,000 | Provido |
| 12 Jan 2015 | $100,000 | Vantage/Alabron |
| 21 Jan 2015 | $14,000 | Provido |

76.   Other Bauer Ring Members likewise received Virtus sale proceeds from Swiss Platform #1 omnibus vehicles.  These distributions included:

| Date | Amount | Swiss Platform #1 Sender | Front Company/ Other Recipient | Beneficial Owner / *Explanation* |
|------|--------|--------------------------|-------------------------------|----------------------------------|
| 31 July 2014 | $600,000 | Vantage/Alabron | Shine Invest Ltd | Auringer |
| 1 Aug 2014 | $200,000 | Vantage/Alabron | Rosefairy Finance | Auringer |
| 3 Oct 2014 | $400,000 | Vantage/Alabron | Malive | Friedlander |
| 23 Oct 2014 | $72,500 | Vantage/Alabron | Banford Trading | Bauer |
| 27 Oct 2014 | $280,000 | Vantage/Alabron | Malive | Freidlander |
| 3 Nov 2014 | $40,000 | Provido | Bauer | Bauer / none |
| 13 Nov 2014 | $40,000 | Vantage/Alabron | Bauer | Bauer / "loan" |
| 24 Nov 2014 | $40,000 | Vantage/Alabron | Swiss Realty Co A | NA / ref "Bauer" |
| 24 Nov 2014 | $100,000 | Vantage/Alabron | Bauer | Bauer / none |
| 2 Dec 2014 | $87,187 | Provido | Bauer | Bauer / "loan" |

77.   Pozzoni and Auringer also received Virtus stock sale proceeds from Swiss Platform #2 (as did other Bauer Ring members).   These included the following:

| Date | Amount | Swiss Platform #2 Sender | Front Company Recipient | Beneficial Owner |
|------|--------|--------------------------|-------------------------|------------------|
| 11 Aug 2014 | $65,000 | Waterfall Group Investments | Marina Capital | Pozzoni |
| 14 Aug 2014 | $500,000 | Epsom Investment Services | Shine Invest | Auringer |
| 6 Jan 2015 | $50,000 | Waterfall Group Investments | Marina Capital | Pozzoni |

78.   Finally, for his part, Kambeitz received hundreds of thousands of dollars in Virtus stock-sale proceeds, over and above the cost of the Virtus promotions he arranged.  The

following table provides a non-exhaustive illustration of these receipts, all of which were funded, directly or indirectly, by sales of Virtus stock to unsuspecting retail investors:

| Date | Amount | Sender | Front Company Recipient | Beneficial Owner |
|---|---|---|---|---|
| 31 July 2014 | $25,000 | Provido | Braiden Holdings Ltd | Kambeitz |
| 5 Aug 2014 | $25,000 | Provido | Braiden Holdings Ltd | Kambeitz |
| 13 Aug 2014 | $50,000 | Yxime | Braiden Holdings Ltd | Kambeitz |
| 20 Aug 2014 | $25,000 | Provido | Braiden Holdings Ltd | Kambeitz |
| 28 Aug 2014 | $25,000 | Provido | Braiden Holdings Ltd | Kambeitz |
| 5 Sep 2014 | $25,000 | Provido | Braiden Holdings Ltd | Kambeitz |
| 16 Sep 2014 | $50,000 | Vantage/Alabron | Gumball Business Corp | Kambeitz |
| 22 Sep 2014 | $50,000 | Vantage/Alabron | Gumball Business Corp | Kambeitz |
| 22 Sep 2014 | $25,000 | Vantage/Alabron | Braiden Holdings Ltd | Kambeitz |
| 2 Oct 2014 | $25,000 | Blue Leaf Capital | Braiden Holdings Ltd | Kambeitz |
| 3 Oct 2014 | $75,000 | Adairius | Braiden Holdings Ltd | Kambeitz |
| 22 Oct 2014 | $25,000 | Adairius | Braiden Holdings Ltd | Kambeitz |
| 23 Oct 2014 | $50,000 | Yxime | Braiden Holdings Ltd | Kambeitz |
| 9 Dec 2014 | $50,000 | Adairius | Braiden Holdings Ltd | Kambeitz |
| 18 Dec 2014 | $50,000 | Adairius | Braiden Holdings Ltd | Kambeitz |
| 15 May 2015 | $50,000 | Adairius | Zombas Media Ltd | Kambeitz |
| **TOTAL** | **$625,000** | | | |

79.     During the Bauer Ring's Virtus stock dump, at least 128 investors residing within the Southern District of New York purchased a total of at least 258,493 shares of Virtus, and sustained combined losses totaling at least $219,503.

**C.     Example Two: The Sidoo & Bauer Ring Coalition's North American Oil (NAMG) Fraud**

80.     Before the Virtus stock dump, but using a methodology similar to that used with Virtus, Defendant Sidoo joined forces with at least three members of the Bauer Ring – Bauer, Auringer and Kambeitz – in perpetrating a fraudulent penny stock dump involving North American Oil.

**i.     Acquiring the Issuer and All Its Purportedly Free-Trading Shares**

81.     In the case of North American Oil, it was Sidoo who first acquired the public shell named Calendar Dragon Inc. ("Calendar Dragon") that would later become North American Oil.

Sidoo did so through an April 3, 2012, $350,000 wire from his Swiss-banking, Swiss Platform

#2-administered front company, Oel und Erdgazforschung AG ("Oel & Erdgaz"), to a California

law firm's trust account.  As Swiss Platform #2 contemporaneously noted, this wire was "for a

private purchase of Calendar Dragon Inc shares."

82.     Calendar Dragon had been incorporated in Nevada in 2010, had 3.795 million

shares outstanding, and had (in June 2011) been cleared by FINRA to be quoted on OTC

Markets and was DTC eligible (defined at ¶ 40 above), and whose unlegended shares, thereby,

could be passed off as unrestricted.  Of Calendar Dragon's 3.795 million outstanding shares, 2.22

million were restricted; and the remaining 1.575 million had been issued without restricted

legends pursuant to an S-1 registration statement which the issuer had filed with the Commission

on March 17, 2011, and that the Commission had declared effective on May 11, 2011.

83.     On paper, the 1.575 million unrestricted Calendar Dragon shares covered by the

S-1 were issued to more than 25 individuals residing in the Canadian province of Alberta.  With

his front company's $350,000 wire, however, Sidoo not only acquired every unrestricted share

but also all of Calendar Dragon's restricted shares.  Thus, by the end of April 2012, Sidoo owned

100% of the outstanding shares of the Calendar Dragon.

### ii.     Changing Name, Ticker, Business Plan and Number of Shares

84.     To enhance profits, Sidoo arranged for Calendar Dragon to merge with a private

company that had a business plan which would be appealing to penny stock investors.  To that

end, Calendar Dragon:  (i) changed its name on October 11, 2012 to "North American Oil & Gas

Corp." and later its ticker symbol from CLDD to NAMG; (ii) effected a 19:1 forward stock split

meaning each Calendar Dragon share would become 19 shares of the new company; and (iii)

shifted its purported business focus from creation of a new calendaring tool to the exploration of

oil and gas opportunities.  As a result of the stock split and the merger (the latter of which had the effect of slightly reducing the number of outstanding shares), North American Oil had 60.125 million shares outstanding, 29.925 million of which being purportedly unrestricted and covered by the registration statement referenced in ¶ 82 above.

### iii.    Positioning the Stock for Unloading; Joining With the Bauer Ring

85.    On or about May 29, 2012, when North American Oil was still known as Calendar Dragon, and shortly after acquiring all its purportedly unrestricted shares, Sidoo began positioning those shares, in less-than-5% tranches, to be sold from Swiss Platform #2.   By mid-January 2013, four such tranches, each comprising 2.85 million (or 4.74%) of North American Oil's outstanding shares, had been so positioned on Swiss Platform #2.

86.    By July 2013, Sidoo and at least three members of the Bauer Ring (Bauer, Auringer and Kambeitz) had agreed to work together in perpetrating the North American Oil pump-and-dump, thus forming (or re-convening) the Sidoo & Bauer Ring Coalition.  To that end, the Bauer Ring began positioning millions more of North American Oil's purportedly unrestricted shares to be sold across various Offshore Platforms.  These shares included three of the original Alberta investors' share certificates, comprising (post-split) 2.85 million North American Oil shares, that Bauer (after receiving those certificates from Sidoo) delivered to Blacklight, and that Blacklight, in turn, positioned to be sold through Asia Finance Corporation ("AFC"), a New Zealand brokerage house.

87.    By late September 2013, virtually all of North American Oil's purportedly unrestricted stock had been repositioned by the Sidoo & Bauer Ring Coalition as follows:

| Front Company / Omnibus Vehicle | # of Shares | % of all Shares | Offshore Platform | Date Positioned |
|---|---|---|---|---|
| Paramount Trading Co | 2.85 million | 4.74% | Swiss Pl. #2 | 29 May 2012 |
| Koryak Investments Ltd | 2.85 million | 4.74% | Swiss Pl. #2 | 21 Sep 2012 |

| Front Company / Omnibus Vehicle | # of Shares | % of all Shares | Offshore Platform | Date Positioned |
|---|---|---|---|---|
| Daoli Associates SA | 2.85 million | 4.74% | Swiss Pl. #2 | 26 Sep 2012 |
| Checkmate Ventures Inc | 2.85 million | 4.74% | Swiss Pl. #2 | 9 Jan 2013 |
| Intercontinental Ventures* | 2.85 million | 4.74% | Swiss Pl. #2 | 12 July 2013 |
| Swiss Bank A | 2.85 million | 4.74% | Swiss Pl. #3 | 25 July 2013 |
| Brickets Capital Ltd | 2.375 million | 3.95% | Swiss Pl. #1 | 14 Aug 2013 |
| Rosefairy Finance Ltd‡ | 1.425 million | 2.37% | Swiss Pl. #1 | 14 Aug 2013 |
| Shine Invest Ltd‡ | 0.95 million | 1.58% | Swiss Pl. #1 | 14 Aug 2013 |
| Iconic Investment Co | 2.375 million | 3.95% | Swiss Pl. #2 | 19 Aug 2013 |
| Ardmore Investments Inc** | 1.9 million | 3.16% | Swiss Pl. #2 | 5 Sep 2013 |
| AFC (foreign brokerage) | 2.85 million | 4.74% | Blacklight | 20 Sep 2013 |
| **TOTAL** | **27.55 million** | 48.28% | | |

*Swiss banking front company linked to Bauer*
‡ *Swiss-banking front companies linked to Auringer, as noted above*
**Swiss-banking front company linked to Bauer*

88.     The North American Oil shares detailed in the above table represented over 48% of the company's outstanding stock, and fully 92% of its purportedly unrestricted stock. All of these shares had been issued without restrictive legend. (Shares issued without restrictive legend are commonly treated by securities brokers and transfer agents as immediately and freely tradeable.) Yet, every one of these "unrestricted" shares were controlled by Sidoo, Bauer and Auringer, who, because of their control of all North American Oil's shares, were, individually and collectively, affiliates of the Issuer.

89.     Because these shares were controlled by Sidoo, Bauer and Auringer, who together and separately were affiliates of North American Oil, as a matter of law, the shares were restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.

90.     By having their North American Oil shares allocated in multiple different tranches, each of which fell below 5% of the company's total outstanding shares, to various nominee shareholders and omnibus vehicles administered by various Offshore Platforms, Defendants Sidoo, Bauer and Auringer created the false appearance – deceiving North American

Oil's transfer agent, the nominee entities' brokerage firms,  investors, and other market participants – that multiple different, unrelated offshore corporate entities each held less than 5% of North American Oil's stock.  In reality, North American Oil shares nominally lodged with those offshore corporate entities were all under common control by Sidoo, Bauer and Auringer.

91.     Because North American Oil's securities had, since 2012, been registered under Section 12 of the Exchange Act, the beneficial-ownership and insider-transactions-reporting provisions of the federal securities laws applied to holders of its securities.

92.     Despite being beneficial owners of well over 10% – indeed 100% – of North American Oil's securities, Defendants Sidoo, Bauer and Auringer never made any 13D or Form 4 filing with the Commission.  These Defendants' failure to disclose accurate – indeed, any – information about their beneficial ownership of, trading in, or agreements concerning, North American Oil's securities, in the face of duties to do so, defrauded investors by depriving them of this highly material information to which they were, by law, entitled.

### iv.     Promoting the Purchase of North American Oil Stock

93.     With North American Oil's shares under its control and being positioned to be sold on investors, the Sidoo & Bauer Ring Coalition designed, funded, and launched a campaign to urge investors to buy their stock, and enlisted Kambeitz to carry it out.

94.      Kambeitz coordinated the development and dissemination of the North American Oil promotional campaign, which ran from at least July 2013 to January 2014.

95.     The purported paying party for the North American Oil promotional campaign was Genius Marketing Ltd., a Swiss-banking front company Kambeitz owned.

96.     Although Genius Marketing did wire funds totaling over $2.8 million to the various U.S.-based media companies that disseminated the promotional campaign, Genius

Marketing, in fact, as Kambeitz knew, served as a mere pass-through vehicle for these funds. For example, (i) at least $1.27 million of these funds were supplied to Genius Marketing by Sidoo & Bauer Ring Coalition front company (and North American Oil shareholder) Iconic Investments; (ii) at least $100,000 more was supplied to Genius Marketing by one of Auringer's front companies, Shine Invest (which was likewise a North American Oil shareholder); and (iii) at least $800,000 was supplied to Genius Marketing by Vantage/Alabron – with Vantage/Alabron's wires coinciding with, and funded by, the Sidoo & Bauer Ring Coalition's unloading of North American Oil stock through Vantage/Alabron.  In this way, the Coalition funded the North American Oil promotional campaign, as illustrated by the following graphic:



97.    The promotional materials that Kambeitz arranged urged readers to buy North American Oil stock and do so quickly, to capitalize on supposedly realistic prospects of near-term, dramatic gains.  A promotion disseminated in July 2013, for example, urged, "**NAMG** is an immediate BUY!" (emphasis in original), and claimed that "*the situation in Southern*

34

*California*'s San Joaquin Basin, where North American Oil held leases] *is heating up so fast that an inrush of investors could quickly send NAMG soaring as high as $5 a share this year*," adding "*There's a ton of money to be made by getting into* **NAMG** *right now!*" (Emphasis in original). These statements were materially misleading for, among other reasons, they omitted to disclose material facts, including that the parties behind them – the members of the Sidoo & Bauer Ring Coalition – did not believe the statements, as evidenced by their simultaneous, and massive, trading in the opposite direction as they collectively sold their stock during the campaign.

98.    Per Kambeitz's instructions to media companies, the North American Oil promotional materials identified Genius Marketing as the promotions' purported paying party. This representation was false and materially misleading too as, in fact, Genius Marketing was merely a pass-through entity for funding provided by Sidoo, Bauer and Auringer, who controlled literally all of the company's free-trading shares and were therefore affiliates of the Issuer.

### v.    Sidoo, Bauer and Auringer Dump Their North American Oil Stock

99.    The Sidoo & Bauer Ring Coalition's promotional campaign caused dramatic rises in demand for North American Oil stock, as well as its share price. Taking full advantage of this effect, between July 15, 2013 and August 22, 2014, through three of the Offshore Platforms (Swiss Platform #1, Swiss Platform #2 and Blacklight), Sidoo, Bauer and Auringer sold at least 18.8 million North American Oil shares, for proceeds of at least $15.23 million.

100.    Sidoo, Bauer and Auringer reaped their illicit North American Oil proceeds via furtive means. For example, at least $5.48 million in proceeds were realized through three Bauer nominee accounts at AFC: the Blacklight-administered Nerva Associates SA (which was de facto owned by Bauer but straw-owned by Bauer Relative A), and the Swiss Platform #2-administered Waterfall Group Investments Ltd and Ardmore Investments Inc accounts (each of

which was de facto owned by Bauer but straw-owned by a different Russian National).  These proceeds were distributed, as the stock was being sold, from an AFC omnibus account known as London Capital NZ to various front companies controlled by the scheme's participants.  The following table illustrates these distributions:

| Date | Amount | Front Company Recipient | Beneficial Owner | Reference |
|---|---|---|---|---|
| 18 Oct 2013 | $249,123 | Rosefairy Finance Ltd | Auringer | Nerva SA [for] Rosefairy |
| 21 Oct 2013 | $174,385 | Rosefairy Finance Ltd | Auringer | Nerva AS [sic] |
| 22 Oct 2013 | $249,123 | Rosefairy Finance Ltd | Auringer | Nerva AS [sic] |
| 1 Nov 2013 | $400,000 | Rosefairy Finance Ltd | Auringer | Nerva share sales |
| 5 Nov 2013 | $1,019,000 | Oel und Erdgazforschung AG | Sidoo | NAMG shs LC Waterfall |
| 7 Nov 2013 | $617,896 | Oel und Erdgazforschung AG | Sidoo | NAMG Waterfall… shares |
| 7 Nov 2013 | $260,482 | Ardmore Investments Inc | Bauer | NAMG Waterfall… shares |
| 21 Nov 2013 | $29,974 | World Time Ltd | Bauer | Nerva Assoc share sales |
| 29 Nov 2013 | $299,970 | Aquila Assets Inc | Auringer | Nerva |
| 12 Dec 2013 | $146,446 | Ardmore Investments Inc | Bauer | NAMG sales…Waterfall |
| 17 Dec 2013 | $235,070 | Ardmore Investments Inc | Bauer | NAMG |

101.    Bauer also reaped additional North American Oil stock sale proceeds through wires from Swiss Platform #1's omnibus vehicle, Vantage/Alabron, to certain of his front companies, as this table reflects:

| Date | Amount | Bauer Front Company Recipient | Offshore Platform |
|---|---|---|---|
| 10 Dec 2013 | $50,000 | Intercontinental Ventures Group Ltd | Swiss Platform #2 |
| 16 Dec 2013 | $50,000 | Intercontinental Ventures Group Ltd | Swiss Platform #2 |
| 31 Dec 2013 | $30,000 | Intercontinental Ventures Group Ltd | Swiss Platform #2 |
| 18 Feb 2014 | $150,000 | Banford Trading Corp | Swiss Platform #3 |

102.    Sidoo & Bauer Ring Coalition Members continued to receive distributions of their North American Oil stock sales until as late as Summer 2014, including two distributions from Paramount Trading Company ("Paramount"), an omnibus vehicle of Swiss Platform #2, which were funded by Paramount's sales of North American Oil through a brokerage house in the UK:

| Date | Amount | Front Company Recipient |
|------|--------|-------------------------|
| 11 July 2014 | $165,000 | Intercontinental Ventures Group Ltd (Bauer) |
| 7 Aug 2014 | $50,700 | Oel und Erdgazforschung AG (Sidoo) |

103.     During the Sidoo & Bauer Ring Coalition's North American Oil stock dump, at least 77 investors residing within the Southern District of New York purchased a total of at least 834,462 shares of North American Oil, and sustained combined losses totaling at least $274,684.

**D.     Example Three: The Mihaylov & Bauer Ring Coalition's Steampunk (SPWZ) Fraud**

104.     Using a methodology similar to that used with Virtus and North American Oil, a slightly different combination of Defendants – the full Bauer Ring plus Mihaylov (the "Mihaylov & Bauer Ring Coalition") – perpetrated a fraudulent stock dump of Steampunk Wizards.  This group of Defendants arranged for millions of the Issuer's shares to be reissued in the names of offshore front companies, in tranches of less than 5% of its outstanding stock, and to be deposited with various Offshore Platforms.

**i.     Positioning Steampunk's Stock for Unloading**

105.     By April 27, 2015, the Mihaylov & Bauer Ring Coalition had positioned, at Offshore Platforms, over 93% of the Steampunk shares then available for trading, as follows:

| Front Company / Omnibus Vehicle | # of Shares‡ | % of all Shares | Offshore Platform | Date Positioned |
|---------------------------------|--------------|-----------------|-------------------|-----------------|
| Equitable Investments Inc | 720,000 | 3.22% | Swiss Pl. #1 | 2 May 2014 |
| Nessa Ventures Ltd | 900,000 | 4.03% | Swiss Pl. #1 | 2 May 2014 |
| Ormer Ventures Corp | 900,000 | 4.03% | Swiss Pl. #1 | 2 May 2014 |
| Alveston Partners Inc╫ | 720,000 | 3.22% | Blacklight | 4 June 2014 |
| World Time Ltd╫ | 720,000 | 3.22% | Blacklight | 4 June 2014 |
| Jeron Capital Inc* | 720,000 | 3.22% | Blacklight | 17 June 2014 |
| Calista Worldwide Inc | 720,000 | 3.22% | Swiss Pl. #1 | 27 Apr 2015 |
| **TOTAL** | **5.4 million** | **24.16%** | | |

‡ *post 7/2/2015 reverse split.*
*Ferris front company*
╫ *Straw-owned Bauer front companies*

106.    The shares detailed in the above table represented over 24% of Steampunk's outstanding stock, and fully 93% of its shares then available for trading.  All of these shares had been issued without restrictive legend.   Yet, in reality, every one of these "unrestricted" shares were controlled by Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni, who, because of their control of all Steampunk shares, were, individually and collectively, affiliates of the Issuer.

107.    Because these shares were controlled by Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni, who together and separately were affiliates of Steampunk, as a matter of law, the shares were restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.

108.    By having their Steampunk shares allocated in multiple different tranches, each of which fell below 5% of the company's total outstanding shares, to various nominee shareholders and omnibus vehicles administered by various Offshore Platforms, Defendants Mihaylov, Bauer, Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni created the false appearance – deceiving Steampunk's transfer agent, the nominee entities' brokerage firms, investors, and other market participants – that multiple different, unrelated offshore corporate entities each held less than 5% of Steampunk's stock.  In truth, those offshore corporate entities were all under common control by Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni.

### ii.    Promoting the Purchase of Steampunk Stock

109.    With control of virtually all of Steampunk's tradeable shares, and as those shares were being positioned to be sold, the Mihaylov & Bauer Ring Coalition designed, funded, and launched a campaign urging investors to buy the stock, and enlisted Kambeitz to carry it out.

110.    Kambeitz coordinated the development and dissemination of the Steampunk promotional campaign, which ran from at least August 2015 to October 2015.

111.    The purported paying party for the promotional campaign was Ikon Media; the purported publisher was Herwick Ltd, a Hong Kong-banking company owned by Kambeitz.

112.    The Steampunk promotional materials urged readers to buy the stock and do so quickly, to capitalize on supposedly realistic prospects of near-term, dramatic gains.  A promotion disseminated in November 2015, for example, urged:  "Investors Who Act Fast Could Walk Away with QUICK 2,043% Gains! … *URGENT*:  BUY *SPWZ* [Steampunk] UP TO $1.50 PER SHARE … NOW!"  (Emphasis in original).  These statements were materially misleading for, among other reasons, they omitted to disclose material facts, including that the parties behind the statements – the Mihaylov & Bauer Ring Coalition – did not believe the statements, as evidenced by their simultaneous, and massive, trading in the opposite direction, as they collectively sold their stock during the campaign.

113.    The Steampunk promotional materials consistently identified Ikon Media as the promotions' purported paying party, and Herwick Limited as the promotions' publisher, and included this statement:  "The publisher [Herwick] has not undertaken to determine if Ikon Media is, or intends to be in the future, directly or indirectly, a [Steampunk] shareholder as it has no meaningful way to verify such facts."   This representation was false and materially misleading too because, among other things, (i) the real paying party behind the promotions was not Ikon Media but instead the Mihaylov & Bauer Ring Coalition; (ii) Herwick was Kambeitz, who, as a Bauer Ring member in constant communication with Bauer and Auringer, did have a "meaningful way" to verify the shareholder status of the promotion's paying party; and (iii) it falsely implied some distance between the paying party and the publisher when, in fact, they were all members of the same ring acting in concert.

### iii.    Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni Dump Steampunk Stock

114.    The Mihaylov & Bauer Ring Coalition's Steampunk campaign was attended by dramatic rises in demand for Steampunk stock, as well as its share price.  Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni took full advantage of these price and demand increases.  Between August 3, 2015 and November 17, 2016, through three of the Offshore Platforms (Swiss Platform #2, Blacklight and the Asia Platform), the Mihaylov & Bauer Ring Coalition sold at least 4.05 million Steampunk shares, for proceeds of at least $3.29 million.

115.    As the shares were being sold to unsuspecting retail investors, Bauer used cellular phone SMS messages to a Blacklight principal to direct sales, as well as to receive real-time confirmations of their execution.  These SMS messages included the following:

| Date | Sender | Recipient | Message |
|------|--------|-----------|---------|
| 18 Dec 2015 | Bauer | Blacklight Exec #1 | "Hey – what did you sell yest[erday] of spwz? Any today?" |
| 18 Dec 2015 | Blacklight Exec #1 | Bauer | "TOTAL SPWZ SOLD 14,500 @ 0.661234 [today]" "SPWZ SOLD 47,000@0.68 [yesterday]" |
| 5 Jan 2016 | Bauer | Blacklight Exec #1 | "Also 9700 bid on SPWZ at 40c sell that too then offer 10k at 43 and 44 for 20k extra" |
| 5 Jan 2016 | Blacklight Exec #1 | Bauer | "21,000 SPWZ SOLD @0.405458" |
| 7 Jan 2016 | Bauer | Blacklight Exec #1 | "Hey! Please offer 50k spwz at 48c" |

116.    Mihaylov, Bauer, Auringer, Ferris, Friedlander and Pozzoni used various Offshore Platforms to unload their Steampunk stock, including the following:

| Date Range | Shares Sold | Proceeds | Selling Vehicle | Platform |
|------------|-------------|----------|-----------------|----------|
| 11/9/15 - 5/18/16 | 808,000 | $252,000 | Romax Investment Services Ltd ("Romax") | Swiss Platform #2 |
| 8/3/15 – 10/5/15 | 720,000 | $1,195,000 | World Time Ltd‡ | Blacklight |
| 9/2/15 – 12/17/15 | 720,000 | $1,353,000 | Pointfort Inc‡ | Blacklight |

‡*Straw-owned Bauer front companies.*

40

117.     As their Steampunk stock sale proceeds were coming in, Mihaylov, Bauer,

Auringer, Ferris, Friedlander and Pozzoni took distributions of them via furtive means.  These

furtive means included (i) using their offshore front companies to receive distributions, (ii)

falsely characterizing distributions (as "loans," "fees" or otherwise), (iii) using distributions to

pay third-party service providers they owed, and (iv) using distributions to reload, or "top up,"

their Swiss bank-issued VISA debit cards.  These furtive distributions included the following

illustrative examples:

| Date | Amount | Sender | Recipient | Beneficiary (description) |
|---|---|---|---|---|
| 14 Aug 2015 | $100,000 | World Time | Aquila Assets | Auringer (front company) |
| 20 Aug 2015 | $75,000 | World Time | Aquila Assets | Auringer (front company) |
| 28 Aug 2015 | $100,000 | World Time | Bauer | Bauer (purported "loan") |
| 3 Sept 2015 | $200,000 | World Time | Trident Corporation FZE | Mihaylov (front company) |
| 17 Sep 2015 | $131,942 | Pointfort | Travel Agency A | Bauer (family holiday/travel) |
| 24 Sep 2015 | $100,000 | Pointfort | Bauer | Bauer (purported "loan") |
| 30 Sep 2015 | $100,000 | Pointfort | Bauer | Bauer (purported "loan") |
| 30 Sep 2015 | $139,000 | Pointfort | Solution Innovator Ltd | Mihaylov (front company) |
| 8 Oct 2015 | $200,000 | World Time | Trident Corporation FZE | Mihaylov (front company) |
| 19 Oct 2015 | $100,000 | World Time | Bauer | Bauer (purported "loan") |
| 21 Oct 2015 | $200,000 | World Time | Trident Corporation FZE | Mihaylov (front company) |
| 22 Oct 2015 | $20,200 | World Time | Travel Agency B | Bauer (family holiday/travel) |
| 29 Oct 2015 | $50,000 | Pointfort | Bauer | Bauer (purported "loan") |
| 9 Nov 2015 | $7,500 | Romax | Friedlander | Friedlander ("service fees") |
| 4 Dec 2015 | $50,000 | Romax | Excalibur Venture Cap. | Friedlander (his company) |
| 21 Mar 2016 | $50,000 | Pointfort | Ferris | Ferris (consultancy fees) |
| 1 Apr 2016 | $10,000 | Romax | Prepaid Debitcard x4640 | Pozzoni (card user) |
| 17 May 2016 | $10,000 | Romax | Prepaid Debitcard x4640 | Pozzoni (card user) |
| 9 June 2016 | $10,000 | Romax | Prepaid Debitcard x4640 | Pozzoni (card user) |
| 23 June 2016 | $10,000 | Romax | Prepaid Debitcard x4640 | Pozzoni (card user) |
| 3 Feb 2017 | $15,000 | Romax | Prepaid Debitcard x4640 | Pozzoni (card user) |
| 4 Apr 2017 | $15,000 | Romax | Prepaid Debitcard x4640 | Pozzoni (card user) |

118.     During the Mihaylov & Bauer Ring Coalition's Steampunk stock dump, at least

25 investors residing within the Southern District of New York purchased a total of at least

48,076 shares of Steampunk, and sustained combined losses totaling at least $57,999.

### E.   Example Four: The Bauer-Ferris Duo's Polar Petroleum (POLR) Fraud

119.   Using a methodology similar to that used with Virtus, North American Oil, and Steampunk Wizards, Defendants Bauer and Ferris perpetrated a fraudulent pump-and-dump of Polar Petroleum.  This pair of Defendants again (i) arranged for millions of shares of the Issuer to be reissued in the names of offshore front companies, in tranches of less than 5% of the Issuer's outstanding stock, and to be deposited with various Offshore Platforms, (ii) orchestrated and funded a materially misleading promotional campaign touting the stock, (iii) exploited the share price and demand rises triggered by that campaign to unload their stock, and (iv) reaped their illicit proceeds by furtive means.

#### i.   Positioning Polar Petroleum Stock for Unloading

120.   In the case of Polar Petroleum, the offshore vehicles into which Bauer and Ferris caused millions of shares to be positioned for unloading on unsuspecting investors included Swiss Platform #2-administered omnibus vehicle Koryak and front company account Zallas Trading Corporation, and Swiss-Platform #3-administered account JTE Finanz in Trust, whose beneficial owner was Bauer.

121.   Because all, or virtually all, of Polar Petroleum's purportedly unrestricted shares were controlled by Bauer and Ferris, they, both together and separately, were affiliates of Polar Petroleum and therefore, as a matter of law, the shares were restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.

122.   By having their Polar Petroleum shares allocated in multiple different tranches, each of which fell below 5% of the company's total outstanding shares, to various nominee shareholders and omnibus vehicles administered by various Offshore Platforms, Defendants Bauer and Ferris created the false appearance – deceiving Polar Petroleum's transfer agent, the

nominee entities' brokerage firms, investors, and other market participants – that multiple different, unrelated offshore entities each held less than 5% of Polar Petroleum's stock.  In reality, the shares nominally lodged with these entities were controlled by the Bauer-Ferris Duo.

### ii.    Promoting the Purchase of Polar Petroleum Stock

123.    With virtually all of Polar Petroleum's tradeable shares under its control, and as those shares were being positioned to be sold on unsuspecting investors, the Bauer-Ferris Duo designed, funded, and launched a campaign urging investors to buy Polar Petroleum stock.

124.     Ferris coordinated the development and dissemination of the Polar Petroleum promotional campaign, which ran from at least April to June 2013 (at which point the Commission issued an Order suspending trading in Polar Petroleum).

125.    The purported paying parties for this campaign were Atlanticos Media Servicos Limitada ("Atlanticos") and Commodity United Ltd; the purported publisher was Pond Research LLC.  But in fact it was Bauer and Ferris who funded the Polar Petroleum campaign, using their Swiss-banking, Swiss Platform #2-administered front companies.  For example, on April 8, 2013, within the same Swiss bank, Bauer's Intercontinental Ventures Group Ltd front company transferred $100,000 to Ferris's Speedbird Corp front company, which, in turn, promptly wired that same $100,000 to Atlanticos.  And between April 22 and May 6, 2013, Ferris's Speedbird front company sent three wires to Pond Research LLC totaling approximately $500,000.

126.    The Polar Petroleum promotional materials urged readers to buy the stock and do so quickly, to capitalize on supposedly realistic prospects of near-term, dramatic gains.  An email-blasted Polar promotion disseminated in April 2013, for example, urged:  "Buy Polar Petroleum (**POLR**) now before **a stampede of investors** begins rushing into a rising market for this stock" (emphasis in original), adding, "[t]he fact is, **you need to buy shares** …. This will

43

likely be your last chance to buy Polar Petroleum at its current low levels **before it soars much, much higher**." (Emphasis in original). These statements were materially misleading for, among other reasons, they omitted to disclose material facts, including that the Bauer-Ferris Duo behind them did not believe the statements, as evidenced by the Duo's simultaneous, and massive, trading in the opposite direction as they collectively sold their stock during the campaign.

### iii.    The Bauer-Ferris Duo Dumps Its Polar Petroleum Stock

127.    The Bauer-Ferris Duo's Polar Petroleum promotional campaign caused dramatic rises in demand for the stock, as well as its share price. The Bauer-Ferris Duo took full advantage of this effect. Between April 2 and June 10, 2013, through three offshore vehicles (two administered by Swiss Platform #2 and the other by Swiss Platform #3), the Bauer-Ferris Duo sold at least 2.74 million Polar Petroleum shares, for proceeds of at least $12.4 million.

128.    The Bauer-Ferris Duo then reaped its illicit Polar Petroleum stock sale proceeds via furtive means. For example, as the Swiss Platform #2-administered Zallas and Koryak accounts were receiving proceeds from unloading Polar Petroleum stock, both made disbursements, funded by those proceeds, to Bauer's and Ferris's Swiss-banking front companies. These included (i) transfers from Koryak and from Zallas to Ferris's Speedbird front company, totaling $250,000 and $150,000, respectively and (ii) transfers from Koryak and from Zallas to Bauer's Intercontinental Ventures Group front company, totaling $1.516 million and $521,312, respectively. Bauer's Intercontinental Ventures Group front company, in turn, wired at least $600,000 to Ferris's personal bank accounts, as illustrated in this table:

| Date | Amount | Sender | Recipient |
|---|---|---|---|
| 29 May 2013 | $100,000 | Intercontinental Ventures Group Ltd (Bauer) | Ferris |
| 31 May 2013 | $350,000 | Intercontinental Ventures Group Ltd (Bauer) | Ferris |
| 11 June 2013 | $50,000 | Intercontinental Ventures Group Ltd (Bauer) | Ferris |
| 14 June 2013 | $100,000 | Intercontinental Ventures Group Ltd (Bauer) | Ferris |
| **TOTAL** | **$600,000** | | |

129.    During the Bauer-Ferris Duo's Polar Petroleum stock dump, at least 40 investors residing within the Southern District of New York purchased a total of at least 41,391 shares of Polar Petroleum, and sustained combined losses totaling at least $135,742.

### F.    Example Five: The Sidoo & Bauer Ring Coalition's American Helium (AHELF) Fraud

130.    In addition to the North American Oil fraud, Sidoo partnered with the Bauer Ring in perpetrating at least another fraud, involving the stock of American Helium Corp.  Although American Helium's local market, at all relevant times, has been the TSX Venture exchange in Vancouver, British Columbia, Canada, the company has since January 2018 had "F" shares quoted on the Southern District of New York-headquartered OTC Markets: first (beginning in January 2018) under the ticker symbol UUCRF, and then (since May 18, 2018) as AHELF.

131.    F shares quoted on OTC Markets are continuously priced in accordance with local market share price movements and available liquidity.

132.    At all times, American Helium's F shares have had five market makers, each headquartered in the Southern District of New York.

### i.    Bauer, Auringer and Friedlander Provide Incubation-Stage Funding

133.    By early 2015, Defendants Bauer, Auringer and Friedlander began funding a private, development-stage company that they would later exploit for another pump-and-dump. That company was then called Black Panther Petroleum Corp.

134.    Initially, Bauer, Auringer and Friedlander funded Black Panther Petroleum's operations by drawing upon illicit proceeds of their prior pump-and-dumps.  These early fundings included the following wires from Swiss Platform #1 omnibus vehicles:

| Date | Amount | Sender |
|------|--------|--------|
| 14 January 2015 | $135,000 | Vantage/Alabron |
| 28 May 2015 | $95,000 | Vantage/Alabron |
| 30 October 2015 | $120,000 | Provido |

135.    On or about October 1, 2015, Black Panther Petroleum changed its name (but without changing the name on its bank account) to Bruin Point Energy Corp. (hereinafter "Black Panther/Bruin Point").

136.    Over time, Bauer and Auringer began meeting Black Panther/Bruin Point "cash calls" by wiring funds from their personal accounts, while Friedlander continued to do so using funds on Swiss Platform #1, including the following transfers:

| Date | Amount | Sender |
|------|--------|--------|
| 24 January 2017 | $10,000 | Provido |
| 17 March 2017 | $12,000 | Provido |

**ii.    The Bauer Ring Joins With Sidoo**

137.    Meanwhile, by April 2017, the Bauer Ring had joined with Sidoo and decided to collaborate on bringing forward a new, publicly traded entity, of which Black Panther/Bruin Point would form a part, and from which they all could potentially profit through stock sales.

138.    In furtherance of their collaboration, Sidoo insisted, and the Bauer Ring members agreed, that all would establish brokerage accounts with the same broker, who was a Vancouver-based stockbroker selected by Sidoo (hereinafter "Sidoo's Broker").  By or about May 2017, Bauer, Auringer and Friedlander (among others) had all begun opening accounts with Sidoo's Broker; and by October 2017, Pozzoni and Kambeitz had done so as well.

139.    On July 22, 2017, Bauer emailed this update to Friedlander and other Bauer Ring members: "The deal is on guys …… We get 23M shares – the shell has no debts and 1.5M shares – so we are 94% of the pub co[.] We get 60% of the 23M and need to raise 40% of the money[.] Let's talk on Monday and plan forward[.] Deal is moving fast now – Sidoo has 60% of the money already raised and good to go."

140.    In September 2017, Sidoo, Bauer, Friedlander and Auringer discussed among themselves, including by email, whom they would select as CEO for their planned public company. Ultimately, they selected a longtime subordinate employee of Bauer.

141.    In October 2017, Sidoo, Bauer, Friedlander and Auringer discussed among themselves, including by email, who would be included on subscriber lists for the new company's shares. On October 30, 2017, a Sidoo associate emailed Auringer and others stating in part: "Note that David [Sidoo] is managing the process and he is carefully monitoring the [subscriber] list and who else needs to be added." Subscribers ultimately included various Sidoo entities and associates as well as Auringer, Friedlander, Pozzoni, and newly opened Liechtenstein-domiciled vehicles of Bauer and his wife: Grauspitz Capital Anstalt and Flascherberg Capital Anstalt.

142.    On November 20, 2017, as the first trading day of the new public company approached, Sidoo emailed Bauer, Auringer and Friedlander asking, "do you guys want to do a small cross [trade] out [of] the gate on Bruin at .40c? I think we might want to do [so] as b[a]it. David," to which Auringer replied, "I would be ok with it."

### iii.   The New Publicly Traded Company Emerges

143.   Meanwhile, on September 12, 2017, three British Columbia companies – Karoo Exploration Corp, Bruin Point Energy Ltd (which had become the parent company of Bruin Point/Black Panther), and 1131663 BC Ltd. – entered into an "Amalgamation Agreement."

144.   On December 4, 2017, Karoo Exploration changed its name to Bruin Point Helium Corp and completed a reverse takeover of Bruin Point Energy and 1131663 BC Ltd. Karoo acquired all outstanding shares of Bruin Point Energy and issued 36,990,000 post-Consolidation shares to Bruin Point shareholders.

145.   On December 11, 2017, shares of Bruin Point Helium began trading on the TSX Venture exchange under the ticker BPX.

146.   On January 11, 2018, Bruin Point filed a certification with OTCQB and thereafter was quoted on OTC under the ticker UUCRF.

147.   On May 10, 2018, Bruin Point Helium changed its name to American Helium Inc.

148.   On May 18, 2018, American Helium changed its ticker on OTC Markets from UUCRF to AHELF.

### iv.   Promoting the Purchase of American Helium Stock

149.   With all or virtually all of American Helium's shares under its concerted control and positioned to be sold on unsuspecting investors, the Sidoo & Bauer Ring Coalition designed, funded, and launched a campaign urging investors to buy American Helium stock.

150.   Sidoo coordinated the development and dissemination of the American Helium promotional campaign, which ran from at least March 2018 to July 2018.

151.   Sidoo was involved in engaging almost all of the firms used for the American Helium promotional campaign.  Sidoo signed a service agreement with one of those firms –

NYC Media Company A – which has at all relevant times been headquartered in New York City. Invoices from that company were directed to Sidoo, who approved their payment. Sidoo also had, and exercised, authority over the American Helium promotional and creative content. And Sidoo also contemporaneously reviewed reports from NYC Media Company A reflecting the impact of American Helium promotional activity on its share price and trading volume.

152.    The American Helium promotional materials that Sidoo arranged referenced both American Helium's TSX Venture and its OTC Markets ticker symbols, and were disseminated throughout the United States.

153.    The materials urged readers to buy the stock and do so quickly, to capitalize on supposedly realistic prospects of near-term, dramatic gains. One such promo, disseminated in June 2018 by NYC Media Company A, prominently displayed this quote from Sidoo himself: "*There is a massive rush underway to secure high quality helium assets in the United States and* [American Helium] *sits at the forefront of this cycle*." (Emphasis in original). This and similar such statements in the promotional materials were materially misleading for, among other reasons, omitting to disclose material facts, including that the parties behind the statements – the members of the Sidoo & Bauer Ring Coalition – did not believe the statements, as evidenced by their simultaneous, and massive, trading in the opposite direction as they collectively sold their stock during the campaign.

### v.    The Sidoo & Bauer Ring Coalition Dumps Its American Helium Stock

154.    The Sidoo & Bauer Ring Coalition's American Helium promotional campaign caused dramatic rises in demand for American Helium stock, as well as its share price. The Sidoo and Bauer Ring Coalition took full advantage of this effect. Between March 2018 and

February 2020, accounts associated with the Sidoo & Bauer Ring Coalition sold at least 7.64 million American Helium shares, for proceeds of at least $1.45 million.

155.    By design and agreement, the Sidoo and Bauer Ring Coalition coordinated their selling of American Helium stock, primarily through Sidoo's Broker, as this May 18, 2018 email from Sidoo's Broker to Friedlander illustrates:  "Also as discussed and agreed, we may/will bundle your sales with other clients who wish to filter sell like you and with the same parameters considerations (volume/don't hurt market, blended pricing throughout the day)."

156.    During the Sidoo & Bauer Ring Coalition's American Helium stock dump, at least two investors residing within the Southern District of New York purchased a total of at least 6,000 shares of American Helium, and sustained combined losses totaling at least $2,385.

### G.    THE SEPARATE FRAUDS BY MIHAYLOV AND FERRIS (TWO MORE EXAMPLES)

157.    In addition to the fraudulent stock dumps each perpetrated in league with the Bauer Ring, Defendants Mihaylov and Ferris each perpetrated at least one additional fraud.  Each employed similar methodology, and used one or more of the same offshore front companies, Offshore Platforms, or both, as each used in their frauds perpetrated with the Bauer Ring.

#### i.    Mihaylov's Lifelogger Fraud

158.    Mihaylov used Blacklight-administered vehicles to position his Lifelogger stock offshore, in less-than-5% tranches, and later sell it to unsuspecting investors – just as he did with Steampunk, described above.  The Blacklight administered vehicles Mihaylov used for this purpose included his Fibex Holdings Limited and Paradigm Ventures Inc. front companies, each of which had a straw owner.  These allocations and unloadings were fraudulent for the same reasons as were similar allocations and unloadings in the Steampunk fraud, described above.

50

159.    During Mihaylov's Lifelogger stock dump (when he sold at least 24.93 million shares for proceeds totaling at least $12.15 million), at least 127 investors residing within the Southern District of New York purchased a total of at least 221,955 shares of Lifelogger, and sustained combined losses totaling at least $42,481.

### ii.    Ferris's Blue Eagle Lithium Fraud

160.    Ferris utilized Blacklight-administered vehicles to position his Blue Eagle Lithium stock offshore, in less-than-5% tranches, and later unload it on unsuspecting investors – just as he did with the Virtus and Steampunk frauds, described above, which he had perpetrated with the Bauer Ring.  The Blacklight administered vehicle Ferris used for this purpose was Apollo Ventures Inc. (a front company de facto owned by another member of the penny stock fraud community, but made available to Ferris for purposes of his Blue Eagle fraud). These allocations and unloadings were fraudulent for the same reasons as were similar allocations and unloadings in the Virtus and Steampunk frauds, described above.

161.    During Ferris' Blue Eagle stock dump (when he, along with others not named here, sold at least 4.98 million Blue Eagle shares for illicit proceeds totaling at least $5.95 million), at least 50 investors residing within the Southern District of New York purchased a total of at least 143,701 shares, and sustained combined losses totaling at least $99,962.

### H.    DEFENDANTS' PUMP-AND-DUMPS OF OTHER PENNY STOCKS

162.    In addition to the pump-and-dumps described above, various combinations of the Defendants effected similar fraudulent pump-and-dumps during the course of their fraud scheme, of numerous other penny stocks, including, but not limited to, the following issuers' stocks: Cyberfort Software Inc. (CYBF); Cantabio Pharmaceuticals Inc. (CTBO); Black Stallion Oil and Gas Inc. (BLKG) (currently known as Arize Therapeutics Inc.); PetroTerra Corp. (PTRA)

(currently known as Transportation & Logistics Systems Inc.); Black River Petroleum Corp. (BRPC); Gray Fox Petroleum Corp. (GFOX); Patriot Berry Farms Inc. (PBFI); Bison Petroleum Corp. (BISN) (currently known as Yinhang Internet Technologies Inc.); Lone Star Gold Inc. (LSTG) (currently known as Good Hemp Inc.); and True North Energy Corp. (TNEN).

163.    Defendants conducted the pump-and-dumps of these additional stocks similarly to those described above.  In these additional frauds, the relevant combination of Defendants: (1) exploited materially misleading promotional campaigns to boost demand for the stock; (2) used an array of Offshore Platform-supplied vehicles to fraudulently spread out and conceal their ownership and control of each Issuer's purportedly unrestricted shares in order to (3) those shares to unsuspecting retail investors in the midst of promotional campaigns that they arranged, and (4) reap distributions of the resulting proceeds furtively, typically (5) while also flouting their affirmative reporting obligations under the federal securities laws – as controlling shareholders of each  Issuer – to report their holdings and trading.  The following table provides a non-exhaustive overview of the additional stocks comprising Defendants' scheme:

| Issuer (Ticker, CIK) | Date Range of Stock Sales | Estimated Illicit Proceeds | Complicit Defendants |
|---|---|---|---|
| CYBF (0001522787) | 11/2016 – 12/2018 | $1.37 million | Bauer & Ferris |
| CTBO (0001557565) | 11/2015 – 10/2018 | $2.56 million | Bauer Ring |
| BLKG (0001542335) | 10/2014 – 11/2016 | $3.5 million | Bauer Ring |
| PTRA (0001463208) | 5/2014 – 9/2016 | $3.96 million | Bauer Ring |
| BRPC (0001479000) | 4/2014 – 5/2014 | $417,000 | Bauer & Ferris |
| GFOX (0001546589) | 11/2013 – 8/2014 | $11.8 million | Bauer Ring |
| PBFI (0001522787) | 8/2013 – 2/2016 | $425,000 | Bauer & Ferris |
| BISN (0001494722) | 2/2013 – 9/2015 | $2.36 million | Bauer Ring |
| LSTG (0001464865) | 8/2011 – 1/2013 | $4.9 million | Bauer Ring |
| TNEN (0001292521) | 4/2006 – 5/2007 | $40.23 million | Bauer Ring |
| | TOTAL | $71.52 million | |

164.    During the True North Energy (TNEN) stock dump (the last pump-and-dump listed in the above table) at least 153 investors residing within the Southern District of New York

purchased a total of at least 193,628 shares of True North Energy, and sustained combined losses totaling at least $416,556.  Similarly, during the dumping phase of each of other the penny stock pump-and-dumps listed in the above table, purchasers of each of the stocks listed therein, on information and belief, likewise included investors residing within the Southern District of New York, who sustained substantial losses.

## III.    DEFENDANTS HAVE SPENT LITTLE TIME IN THE UNITED STATES

165.    Facts relevant to the timeliness of certain of the relief sought by the Commission include whether, how recently, and for how much time in total, the Defendants have been present in the United States since violating the federal securities laws.

166.    A Defendant who did not once enter the United States in the five years following a violation of the federal securities laws cannot avail him- or herself of the five-year statute of limitations for civil money penalties set forth in 28 U.S.C. § 2462 for that violation.

167.    Defendant Mihaylov, for example, has not once entered the United States since 2004, on information and belief.   He therefore has no statute of limitations defense to the remedy of civil monetary penalties for any of his securities law violations alleged in this case.

168.    Additionally, the current, five-year and ten-year statutes of limitations for disgorgement and injunctive relief contain a tolling provision under which the time period for such remedies runs only when the Defendant is within the United States.[10]  On information and belief, each of the other Defendants' individual, cumulative time spent in the United States is far less than five years – with the longest total of any Defendant being about three years, at most. As a result, the disgorgement and injunctive relief remedies sought in this case against each of the Defendants all remain timely, across the entire time period of the violations alleged herein.

---

[10] *See* 15 U.S.C. § 78u(d)(8)(C).

### FIRST CLAIM FOR RELIEF
### <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz)**

169.     Paragraphs 1 through 168 above are re-alleged and incorporated by reference as if fully set forth herein.

170.     By reason of the conduct described above, defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz, in the offer or sale of securities of one or more of Virtus, North American Oil, Steampunk, Polar Petroleum, American Helium, Lifelogger, Blue Eagle, Cyberfort, Cantabio, Black Stallion, PetroTerra, Black River Petroleum, Gray Fox Petroleum, Patriot Berry Farms, Bison Petroleum, Lone Star Gold and True North Energy Corp., by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently, (i) employed devices, schemes, or artifices to defraud; and/or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

171.     By reason of the conduct described above, defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless restrained and enjoined.

### SECOND CLAIM FOR RELIEF
### <u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>

**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz)**

172.     Paragraphs 1 through 168 above are re-alleged and incorporated by reference as if fully set forth herein.

173.    By reason of the conduct described above, defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of securities of one or more of Virtus, North American Oil, Steampunk, Polar Petroleum, American Helium, Lifelogger, Blue Eagle, Cyberfort, Cantabio, Black Stallion, PetroTerra, Black River Petroleum, Gray Fox Petroleum, Patriot Berry Farms, Bison Petroleum, Lone Star Gold and True North Energy Corp, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange: (i) employed devices, schemes, or artifices to defraud; and/or (ii) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

174.    By engaging in the foregoing conduct, Defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES

**(Violations of Sections 5(a) and 5(c) of the Securities Act by Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz)**

175.    Paragraphs 1 through 168 above are re-alleged and incorporated by reference as if fully set forth herein.

176.    At all relevant times, the securities of one or more of Virtus, North American Oil, Steampunk, Polar Petroleum, Lifelogger, Blue Eagle, Cyberfort, Cantabio, Black Stallion, PetroTerra, Black River Petroleum, Gray Fox Petroleum, Patriot Berry Farms, Bison Petroleum, Lone Star Gold and True North Energy Corp., referenced above as having been sold by some or

all of Defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz were not registered in accordance with the provisions of the Securities Act and no exemption from registration was available.

177.    Defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz's offers and sales of the securities of one or more of Virtus, North American Oil, Steampunk, Polar Petroleum, Lifelogger, Blue Eagle, Cyberfort, Cantabio, Black Stallion, PetroTerra, Black River Petroleum, Gray Fox Petroleum, Patriot Berry Farms, Bison Petroleum, Lone Star Gold and True North Energy Corp., were made in the United States in that (a) sales were executed by broker-dealer firms in the United States; (b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to the sales passed in the United States.

178.    By reason of the foregoing, defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz, directly or indirectly, made use of the means and instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was available.

179.    By reason of the foregoing, defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz violated and, unless restrained and enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests the Court to enter a Judgment that:

A.    Permanently retrains and enjoins the defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz, and their agents, servants, employees and

attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from:

1.      violating Section 17(a) of the Securities Act [15 U.S.C. §§77q(a)];

2.      violating Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

3.      violating Section 5 of the Securities Act [15 U.S.C. § 77e); and

4.      directly or indirectly, including but not limited to, through any entity each owns or controls, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent defendants from purchasing or selling securities listed on a national securities exchange for their own personal account;

B.      Permanently bars Defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz from:

1.      participating in an offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

2.      serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

C.      Orders Defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Orders Defendants Bauer, Auringer, Friedlander, Pozzoni, Ferris, Mihaylov, Sidoo and Kambeitz to disgorge, with prejudgment interest, any and all ill-gotten gains each received, or may be liable for jointly and severally, as a result of the conduct described herein;

E.      Retains jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.      Grants such other and further relief as this Court may deem just and proper.

DATED this 14th day of April, 2022.

Respectfully submitted,


/s/   Benjamin D. Brutlag
Benjamin D. Brutlag (BB1196)
Kenneth W. Donnelly (*pro hac vice* motion pending)
(Co-Lead Trial Attorney)
David A. Nasse (*pro hac vice* motion pending)
(Co- Lead Trial Attorney)
J. Lee Buck II

SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC  20549
Phone: (202) 551-4946 (Donnelly direct)
Fax: (202) 708-6087 (fax)
donnellyk@sec.gov (Donnelly email)